### FOSTER v. COMMISSIONER OF INTERNAL REVENUE.

### COMMISSIONER OF INTERNAL REVENUE v. FOSTER.

### No. 3.

Circuit Court of Appeals, Second Circuit.

April 18, 1938.

Mason, Spalding & McAtee, of Washington, D. C. (W. W. Spalding, of Washington, D. C., of counsel), for Emily Foster.

James W. Morris, Asst. Atty. Gen., and J. Louis Monarch and Berryman Green, Sp. Assts. to Atty. Gen., for Commissioner of Internal Revenue.

Before MANTON, AUGUSTUS N. HAND, and CHASE, Circuit Judges.

AUGUSTUS N. HAND, Circuit Judge.

The result of this appeal is by agreement to determine the proper way to compute the income taxes for the year 1930 of four taxpayers, though only those of Emily Foster are immediately reviewed. Both she and the Commissioner of Internal Revenue appeal from an order of the Board of Tax Appeals fixing her tax

deficiency at $6,608.97, the taxpayer on the ground that the Board declined to allow sufficient deductions for losses on sales of stock, and the Commissioner on the ground that it allowed too much for losses on such sales. We think the Board was right and that its order should be affirmed.

The taxpayer is the widow of O. E. Foster of Buffalo, who died in 1928 leaving a substantial fortune. Helen Foster and Edna Foster Smith are their daughters, and Henry O. Smith, now deceased, was the husband of Edna Foster Smith. The estate of O. E. Foster was distributed in kind between his widow Emily Foster and his two daughters, with the exception of two claims against the Bank of Montreal which were transferred to a corporation known as the Lonsdale Assets Corporation organized by the widow and daughters to hold the claims until they could be liquidated. The claims were transferred in consideration for the issue of its capital stock, which was owned 50 per cent. by the widow and 25 per cent. by each of the two daughters, their interests corresponding with the shares they had received in the O. E. Foster estate. Henry O. Smith became the president of the corporation and one Kuhlmann its secretary and treasurer. Neither of them owned any of its stock. It had no activity up to November 25, 1930, other than the holding of the two claims and the effort to realize on them. Prior to that date one of the claims was distributed in kind to the stockholders and the capital stock was reduced accordingly. The remaining claim was written off as worthless and the corporation was dissolved in the year 1932. Prior to November 25, 1930, it had never engaged in the buying and selling of securities. It had its office in the same place as two other corporations in which the taxpayer and her family were interested.

On November 25, 1930, Smith, acting for himself, his mother-in-law (the taxpayer), and his wife and sister-in-law, prepared a list of stocks which these four persons wished to sell in order to create losses for income tax purposes and advised Kuhlmann, the secretary and treasurer of the Assets Corporation, that it might purchase them. The corporation had no funds for the purpose, so a loan of $375,000 was obtained from the Marine Trust Company in which the taxpayer and her family had a substantial stock interest through the intervention of Smith and Kuhlmann. The loan was made without any security, merely on the demand note of the corporation, and, while no time for payment was fixed, it was understood that the loan would be of short duration. The money borrowed from the Trust Company was placed to the credit of the corporation which, on November 26, 1930, drew its checks to the four taxpayers in order to pay for their stocks at the current market price, and the various securities properly indorsed by the owners were transmitted to the Trust Company with instructions to have them transferred to the Assets Corporation. As a result of the distribution by the latter to the taxpayer and her daughters, they at once had large sums to the credit of their individual accounts with the Trust Company. These moneys they proposed to loan to the corporation so that it might repay its loan of $375,000 to the bank. In pursuance of this plan the corporation, on November 26 and 28, 1930, issued its three demand notes aggregating $378,000 drawn respectively to the taxpayer and her two daughters; that is to say, to the taxpayer for $73,000, to Helen Foster for $110,000, and to Edna Foster Smith for $195,000. The taxpayer and her two daughters drew checks for amounts corresponding with these notes to the order of the Assets Corporation, and the latter, out of the proceeds, paid off its indebtedness to the Trust Company on December 1, 1930. Thus, the stocks owned by the taxpayer, her two daughters and son-in-law on November 25, 1930, had been placed in the name of a corporation which the mother and daughters owned and finally the taxpayer and her daughters not only retained stock control of the corporation but held its demand notes in amounts sufficient to cover the value of the stocks transferred.

Beginning January 8, 1931, and ending March 10, 1931, the corporation assigned to the four individuals who had made the transfers of their stock to it all of the securities which had been assigned to it by them in November, 1930. They at the same times drew their individual checks to it for amounts representing the current market value of the stocks being transferred. By means of these reassignments Helen Foster and Henry O. Smith got back the same number of shares of various companies which they had transferred in November, 1930. Helen Foster and Henry

O. Smith also purchased certain of the shares of stock which the taxpayer and Edna Foster Smith had transferred to the Assets Corporation in that month, Henry O. Smith having been furnished most of the money required to make the purchases in January, February, and March 1931 by his wife. The individual checks given to the corporation in exchange for the transfer of the stocks were deposited to its credit and the proceeds used by it to pay off the three demand notes held by the taxpayer and her two daughters. The result of the foregoing transactions was that Helen Foster and Henry O. Smith, early in 1931, got back all the stocks which they had transferred in November, 1930, while the taxpayer and Edna Foster Smith got back only part of theirs.

The Board concluded that the taxpayer and the other three members of her family were not entitled to deduct losses in case of stocks corresponding with those transferred to the Assets Corporation to the extent that they were reacquired in the early part of 1931 by the identical persons who had held them in November, 1930. But the Board allowed deductions to the extent that stocks sold in November, 1930, were not reacquired by the persons who sold them but were transferred to the other members of the family. We think both rulings were right.

While the Board found that "there was no agreement between the parties who transferred the stocks in 1930 to the corporation, and the corporation that the stocks would be subsequently reacquired," yet it was implicit in the decision of the Board that to the extent that the stocks transferred in November, 1930, were reacquired by the very persons who made the transfers, the reacquisition was the result of an original plan to reacquire, for it was found that such stocks "were not sold bona fide and as to these stocks no deductible losses were sustained."

The refusal to allow the deductions in case of the stocks transferred by the taxpayer in November, 1930, and repurchased by her early in 1931, was justified by our decision in Commissioner of Internal Revenue v. Dyer, 2 Cir., 74 F.2d 685, 686. There each of seven persons, on November 30, 1927, sold certain stocks which they held to a company called Elanco which they controlled, and in January, 1928, repurchased a like number and kind of stocks at an advance of twenty cents per share. The company making the purchase gave its notes for the purchase price and on paying them off in 1928 realized a profit of $1,340 which it included in its income tax return for that year. Judge Swan, who wrote the opinion, remarked that: "the inference is inescapable that 'repurchase' of the stock by return of the notes was part of the original plan, and that from the beginning the transferors intended to reacquire their shares in this manner. * * * It is apparent they were acting in concert and had a mutual understanding that the transfers would be rescinded when the notes came due. Under these circumstances it is as though there had been an agreement between all the transferors and Elanco that the sale should be coupled with a contract, or at least an option, to repurchase. The transferors' ownership of their stock was not so completely terminated as to constitute the realization of losses by reason of sales."

In Shoenberg v. Commissioner of Internal Revenue, 8 Cir., 77 F.2d 446, Shoenberg directed his broker to sell on the Exchange shares of stock which he owned and at the same time arranged to have a corporation in which he had a seventy per cent interest buy a like number of such shares. Just over the thirty-day period of the statute he purchased these same stocks from the corporation. The Circuit Court of Appeals for the Eighth Circuit held that in view of the whole transaction he was entitled to no deduction for loss when computing income taxes.

In Marston v. Commissioner of Internal Revenue, 2 Cir., 75 F.2d 936, a taxpayer sold certain stocks at auction some time in 1928. They were purchased by a trust that his deceased wife had created some five years before, of which he was a trustee and under which he was also one of two life beneficiaries, and his three children were remaindermen. In July, 1929, he repurchased a part of the stock sold in 1928, and the balance continued to be held by the trust until 1931 when the corporation which had issued it was dissolved and the trust realized a profit of $3,000. We decided that there was no evidence showing that there had been an agreement to repurchase. Moreover, the case was not one where the taxpayer had complete control of the purchaser at the sale, for he was neither sole trustee nor sole beneficiary under the trust; likewise

the repurchase did not occur until more than six months after the sale.

Whether the plan to reacquire the stocks existed at the time of the original transfers was a question of fact. If no such plan then existed, the losses arising from the sales in November, 1930, were all deductible since no repurchases were made within thirty days. The taxpayer argues that the sales were bona fide because the original offers to sell were made by Henry O. Smith in response to offers to purchase made on behalf of the Assets Corporation by Kuhlmann, its secretary and treasurer. But the stock control of the company was wholly in the hands of the taxpayer and her daughters, and Henry O. Smith, who took Kuhlmann to the trust company to arrange the loan for the purchase of the securities, was acting for himself and as agent for the other members of the family, and was also the president of the Assets Corporation. Under such circumstances the Board was justified in treating the transaction to the extent that it involved a sale and repurchase by the same person as a mere form. Those selling the stock arranged through Henry O. Smith that the Marine Trust Company, of which they were stockholders, should furnish the money to enable the Assets Corporation to pay for it and also arranged to have the proceeds immediately used to liquidate the indebtedness of the corporation to the bank. The sales to a wholly controlled corporation, when followed by a repurchase from it, were properly treated as illusory and as furnishing no basis for an income tax deduction.

The Commissioner contends that a deduction should not have been allowed in case of the shares sold in November, 1930, which were not reacquired by the persons who had originally transferred them. But, since the taxpayer and members of her family, as the Revenue Act then read, might have lawfully secured deductions for losses by selling to one another, it would seem that the same result might be accomplished indirectly through the Assets Corporation where it resold securities to persons other than those who had made the original transfers to it. We think that the Assets Corporation may be regarded as a mere dummy to the extent that there was a transfer to it and a purchase from it by the same person—a person who was one of a group that owned the company; on the other hand, that it may properly be regarded as a genuine purchaser for the purpose of computing deductible losses where it purchased from one person and sold to another. It is argued, however, that there was no proof of a plan to reacquire any of the stocks sold in November, 1930, but only of an adjustment in 1931 among the original stockholders of their various holdings. But the reacquisition of some shares by the very persons who originally made the transfers and the failure to reacquire other shares seem to justify the inference drawn by the Board that the parties arranged in the beginning to do just what was done later.

The order is affirmed.